UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case No. 1:12CR 132 SNLJ |
| ROBERT MICHAEL CHAMBERS, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Robert Michael Chambers has filed Defendant's Motion to Suppress Evidence (Document #28). In his motion, the defendant asks that any and all incriminating evidence, oral or tangible, obtained by "the unlawful search and seizure of defendant on September 7, 2012, in violation of the Defendant's rights under the laws and Constitution of the State of Missouri and the Constitution of the United States be suppressed and not permitted to be received into evidence in this or any other prosecution against the Defendant." (Id., at 2).

In Defendant's Memorandum in Support (Document #29), Mr. Chambers states the issue as "The Government cannot meet its burden to show specific and articulable facts that Defendant was armed and dangerous to support the pat-down search or frisk by Officer Washburn and, therefore, the items seized from Defendant should be suppressed." (Id. at 2).

The court would like to compliment the parties on the quality of their briefs. The briefs have been very helpful to the court.

## Factual Background

On September 7, 2012, at approximately 2:23 A.M., Sikeston Public Safety Officer Carl Rose

observed a gold-colored Cadillac passenger car traveling eastbound on Malone Avenue near Prairie Street. (Tr., pp. 6-7). Officer Rose testified that the vehicle was unable to maintain a single lane, that it had gone to the right shoulder, striking it and then crossed the center line to the left. (Tr., p. 8). The Cadillac turned right onto Main Street and once again crossed the center line of the roadway. (Id.). Rose initiated a traffic stop based upon the lane violations. (Tr., p. 9).

The driver of the vehicle was identified as the defendant, Robert Chambers. (Id.). Officer Rose testified that because of the lane violations that he had observed, he suspected that the driver might be impaired. (Tr., pp. 9-10). The officer smelled a "faint to mild" odor of intoxicants coming from the vehicle and noticed that Chambers seemed nervous, that his eyes were glassy and his pupils were constricted. (Tr., pp. 10, 21). According to Officer Rose, Chambers "showed signs of what [he] had been trained to see as an intoxicated person." (Id.).

While Rose indicated that while everyone seems to be nervous when they encounter the police, Chambers "seemed to be overwhelmed" more than he would expect to see on a routine stop. (Id.). In speaking to Chambers, Officer Rose noted that Chambers's speech was "somewhat slurred," and he admitted to have been drinking earlier in the day. (Tr., p. 11). Based on his observations, Officer Rose came to believe that Chambers was driving under the influence of alcohol and decided to further his investigation (Id.)(Tr., p. 50). He intended to conduct field sobriety tests. (Tr., p. 12). To that end, he requested Chambers to step out of the vehicle (Id.). About this time, Officer Washburn arrived at the scene to serve as backup. (Tr., pp. 12, 63). Washburn initially spoke with the passenger, identified her and ran her through the Police Department's computers. (Tr., p. 63). Officer Rose advised Mr. Chambers to step over to the passenger side of his patrol vehicle. (Tr., p. 12).

As he was speaking with Mr. Chambers, Officer Rose then observed a small white object go out the driver's side window and into the street. (Id.). Rose became concerned because in his experience he had seen people trying to get rid of, or hide objects contained in vehicles by throwing them out the window. (Tr., p. 13).

Rose then instructed Chambers to place his hands on the hood of the patrol car and told Officer Washburn that he had seen something thrown out of the vehicle. (Id.). Officer Rose then spoke to Tara Birdwell, the female passenger, and asked her if she had thrown anything out of the window. (Tr., p. 14). Birdwell became "very irate," started cursing and denied having thrown anything out of the car window. (Id.).

While Rose's attention was diverted toward Birdwell and the search for the object that he had seen thrown from the window, Officer Washburn remained with Chambers. (Tr., pp. 55-56, 64). Washburn testified that after getting out of the car, Chambers began questioning why he had to do that. (Id.). Washburn perceived Chambers as being "agitated" and "distant," but not physically resistant. (Tr., p. 65). Washburn described what he meant by "distant" as follows:

> Every time Officer Rose would get close he would step back, cross his arms, putting his arms down, constantly looking side to side. I don't know if he was trying to look for us or what he was doing and sweating, And at that time of year it was kind of chilly that night, So he did have a heavy coat on, so maybe that was the problem.

(Tr., p. 66).

Given Washburn's training and experience, he felt that such nervousness "generally indicates that they've got something that they don't want us to have, or they've done something that they don't want us to know about." (Id.). Washburn felt unsafe and began to feel some concern not only for his safety, but also the safety of the other officers and given Chambers movements, did not "know

- 3 -

what he was thinking." (Tr., pp. 66, 86). Chambers then told Officer Washburn that he was on parole and "he didn't want to have to go back." (Tr., p. 67). He said he did not want to have any dealings with the police.

Washburn decided that he wanted to do a pat-down search of Chambers because of his constant movements, "for officer safety reasons." (Tr., p. 68). Washburn testified on cross-examination that his understanding of department policy was that he could conduct a pat-down search, "when we feel unsafe." (Tr., p. 86). Officer Washburn was asked by defendant's attorney to describe specifically what it was about Mr. Chambers's movements that concerned him.

> well, he was asked to put his hands on the hood, which he did. Then he would stand up, cross his arms. Back up. Sir, put your hands on the hood. Looking around. Constant movement ... I wasn't sure what his next move was going to be: if he was trying to pull a weapon out, or if he was going to run, or if he was going to swing an arm around and try to strike me. I had no idea.

(Tr., p. 88).

Washburn then asked Chambers if he could conduct a patdown for "our safety and his own," but Chambers did not respond. (Id.). Washburn testified he took Chambers's silence as meaning that he was okay with the procedure, "since he did not tell me that he didn't want to." (Tr., p. 69). Chambers initially remained calm during the search and did not say anything. (Id.). He also responded to Officer Washburn's question about whether he had something that would stick or poke him, that he did not. (Id.). Washburn began to conduct the pat-down search and felt a "large bulge" in Chambers's right front pants pocket that he could not immediately identify. (Id.). Washburn indicated that it was "probably maybe three inches by four inches" and could have possible concealed "some sort of weapon." (Tr., p. 70). Washburn removed it and determined that it was a large sum

of money along with some other items. (Id.). As Washburn turned around to put those things on the car, Chambers fled on foot. (Tr., p. 71).

Washburn commanded Chambers to stop; however, Chambers failed to heed that command. (Id.). After a short foot pursuit, another officer used a Taser on Chambers, subduing him, and the officers placed him under arrest. (Tr., p. 72). A subsequent search of Chambers resulted in the seizure of the methamphetamine that is at issue in this prosecution. (Tr., p. 73).

Officers then obtained and executed a state court search warrant at the defendant's residence and recovered various items of drug consumption paraphernalia plus numerous items and chemicals used in the illicit production of methamphetamine, including 482 pills containing 97.92 grams of pseudoephedrine.

## **The Traffic Stop**

As related in the Factual Background, on September 7, 2012, at approximately 2:23 A.M., Sikeston Public Safety Officer Carl Rose observed the defendant's passenger car make traffic violations. Officer Rose testified that the vehicle was unable to maintain a single lane, that it had gone to the right shoulder, striking it[1] and then crossed the center line[2] to the left. After turning right onto Main Street, defendant's vehicle again cross the center line of the roadway when Officer Rose initiated the traffic stop. "In the context of a traffic stop, '[a]ny traffic violation, however minor, provides probable cause.' United States v. Houston, 548 F.3d 1151 (8th Cir. 2008) (quoting United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004). See also United States v. Coney, 456 F.3d

---

[1]Rose explained, "There's like a small curb on the shoulder of the road." (Tr., p. 8).

[2]Asked to explain "cross the center line," Rose testified, "The left half of the vehicle both tires crossed the center line of the highway." Id.

850, 856 (8th Cir. 2006)." After observing the lane violations, including the defendant's striking a curb, Officer Rose properly stopped the defendant's car for the traffic violations.

### The Frisk or Pat-down Search

At the time he made the stop, Officer Rose felt that the lane violations indicated that the driver of the car might be impaired. (Tr., pp. 9-10). As he approached the vehicle, Officer Rose smelled an odor of intoxicants coming from the vehicle. (Tr., p. 10). The driver was identified as Robert Chambers. Rose advised him of the reason for the stop and asked him if he had had anything to drink that evening. (Id. at 9). "He said somewhat earlier that day." (Id. at 11). Mr. Chambers seemed nervous. His eyes were glassy. His pupils were constricted. He showed signs of what Rose had been trained to see as an intoxicated person. (Id. at 10). Although everyone seems to be nervous when they encounter the police, Officer Rose felt "Mr. Chambers seemed to be overwhelmed more than what I would see on a routine stop." His speech was somewhat slurred. (Id. at 11).

Under the circumstances, Officer Rose believed Mr. Chambers was impaired. (Id.).

An officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968). While "reasonable suspicion" is a less demanding standard than probable cause and considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. United States v. Sokolo, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989). See also United States v. Arvizu, 534 U.S. 266, 274 (2002); Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673 (2000).

The Supreme Court, in Wardlow, 528 U.S. at 124-125, 120 S.Ct. 673, cautioned:

> In reviewing the propriety of an officer's conduct, courts do not have

> available empirical studies dealing with inferences drawn from suspicious behavior, and they cannot reasonably demand scientific certainty from judges or law enforcement officers where non exists. Thus, the determination of reasonable suspicion must be based on common sense judgments and inferences about human behavior. See United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690 (1981).

In Terry, the Supreme Court held that a protective search for weapons is constitutional, even in the absence of traditional Fourth Amendment probable cause, "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous. 392 U.S. at 30, 88 S.Ct. 1868.

In United States v. Davis, 202 F.3d 1060 (8th Cir. 2000), the Court of Appeals for the Eighth Circuit, after quoting the Supreme Court's description of when a protective search for weapons is constitutional as stated above concluded, "The critical inquiry is whether the officer had 'reasonable suspicion.'" 202 F.3d at 1061. A pat-down search protects the officer's personal safety while dealing with a person he reasonably believes may be armed and presently dangerous. 202 F.3d at 1062.

In Davis, on the afternoon of February 10, 1998, Minneapolis Police Officer Giovanni Veliz observed two men, Blount and Davis, attempting to enter an apartment complex at 1826 Chicago Avenue through its secured back door. Sergeant Veliz had been patrolling the complex twice a day since September 1997 at the request of the owner/landlord because of repeated drug dealing and other criminal activity in the area. During those patrols, Veliz had made several narcotics and one weapons arrests. He had come to know most of the apartment residents by sight. When Veliz saw two strangers attempting to enter through the back door, his suspicions were aroused. Blount and Davis spotted Sergeant Veliz's squad car and walked to the front of the building. Sergeant Veliz

drove to the front, exited the squad car and approached the two men and asked if he could talk to them. They agreed, and Blount handed Veliz a driver's license. Veliz immediately pat-searched Blount for weapons. While pat-searching Blount, Veliz observed Davis nervously move behind Veliz, adjust his jacket and place his hand in a jacket pocket. Veliz then pat-searched Davis. When he felt a hard metal object in the jacket pocket, Veliz ordered Davis and Blount to the ground and called for backup. A search of Davis then uncovered the handgun that led to Davis's conviction and 24-month prison sentence. It was Davis who was the appellant in the case. During his appeal, Davis argued that the frisk violated his Fourth Amendment rights.

Originally, Sergeant Veliz's attention was drawn to the fact that two strangers were attempting to enter an apartment complex where repeated drug dealing had occurred through the back door. Later while pat-searching Blount, Veliz observed Davis nervously move behind Veliz, adjust his jacket and place his hand in the jacket pocket. (Id. at 1061). The Court of Appeals in Davis stated, "In denying Davis's motion to suppress, the District Court relied heavily on his furtive actions while Veliz was pat-searching Blount." (Id. at 1062).

In affirming the district court, the Court of Appeals explained the reason it adopted the analysis of the lower court justifying the pat-down search, "While conducting the protective frisk of Blount, Veliz observed Davis moving nervously to the officer's rear. We adopt the Magistrate Judge's analysis of why that suspicious conduct justified the pat-down search of Davis:

> The concern of Veliz, for his personal safety, was not premised upon some illogical, unfounded premonition, but upon the appearance of an observer [Davis], to a pat-search of a companion [Blount], moving to the searcher's backside, while adjusting his jacket, and inserting a hand in his jacket pocket. Given the totality of these circumstances, we find the actions of [Davis] sufficiently ominous to reasonably suggest a threat to Veliz's person.

(Id. at 1063).

## Officer Shane Washburn and What He Observed

As Officer Rose was speaking with the defendant at the driver's side window of the car Rose had stopped, Officer Shane Washburn drove up to serve as backup for Rose. (Tr., p. 63). Asked why he would do that, Washburn responded, "Just for the officer's safety." (Id.). Washburn made contact with the passenger of the vehicle, identified her and ran her identifiers through the Department of Public Safety communications.

Washburn was asked on direct examination if any training that he received as a police officer dealt with recognizing certain danger signs with people who may be combative. (Tr., pp. 59-60). After Washburn answered yes, he was asked to describe some of the things in his training and experience that he might see in a subject that would tend to make him think the subject may become assaultive or combative. Washburn's response was, "Unable to sit still, constantly looking around, sweating when it's really not the temperature to be sweating, constant movements with the hands, unable to focus on questions that might be being asked." (Tr., p. 60).

As Officer Washburn observed the scene, Officer Rose requested the driver to exit his vehicle. Mr. Chambers inquired why that was being done, but he did eventually step out of the car. (Tr., p. 63). Mr. Chambers was agitated. He was not wanting to come out of the car, but he did not have to be assisted from the vehicle. Once he got to the side of the road, he was very distant with Officer Rose. Mr. Chambers was not being physically resistant, but he was being verbally uncooperative. That caused Washburn concern because, "Well, generally if people are not doing anything wrong, they're more than cooperative with us to let us continue our investigation and go on." (Tr., p. 65). Washburn was asked what he meant when he said that Chambers was "very distant with Officer

Rose." Washburn explained:

> it was outside and there was other traffic, so you would have to be kind of close to somebody to hear them. Every time Officer Rose would get close he would step back, cross his arms, putting his arms down, constantly looking side to side. I don't know if he was trying to look for us or what he was doing and sweating. And at that time of year it was kind of chilly that night. So he did have a heavy coat on, so maybe that was the problem.

(Tr., p. 66).

Asked what significance he attached to those observations, Officer Washburn responded, "The nervousness generally indicates that they've got something that they don't want us to have, or they've done something that they don't want us to know about." (Tr., p. 66).

Asked if the nervousness caused concern for his security and the security of the other officers, Washburn responded that it did. "At times when Officer Rose had his back to him, steady hand movements, looking around as either an escape route or, you know, I don't know what he was thinking." (Tr., p. 66).

When asked if Mr. Chambers gave any information about himself, Officer Washburn said:

> He advised that he, you know, was just agitated that he would be asked to even step out of the vehicle. He'd done nothing wrong. He said he was on parole, that he didn't want to have any dealings with the police, because he didn't want to have to go back.

(Tr., p. 67).

Asked if that response caused concern for his security and the security of the other officers, Officer Washburn replied, "Yes, because I didn't know what he was on parole for, if he was on parole for assault or drugs, or I didn't know." (Tr., p. 67).

Officer Washburn determined to do a pat-down search of Mr. Chambers. When asked why

he did that, he replied:

> Just the constant movements for officer safety reasons. Officer Rose had thought he witnessed somebody - - the passenger throw something out of the car, so Mr. Chambers had his hands on the front of Officer Rose's patrol unit. And I asked him if I could conduct a pat down for our safety and his own, and he never said anything.

(Tr., p. 68). Asked if Chambers didn't say yes and didn't say no, Washburn said "No. He just said he was on parole and didn't want to deal with us." (Tr., p. 68).

Washburn patted down the right side of Chambers first and on the outside of his pants, Washburn "felt a large bulge in his front right pocket." (Tr., p. 69). The object was maybe three inches by four inches, something that may have either been a weapon or could have concealed a weapon. (Tr., p. 70). It was a large sum of money. Washburn thought that was unusual "because usually people don't carry that large amount of money around town with them." (Id.).

Washburn had to use both hands to get out the large amount of money and other belongings from Chambers's pocket on the right side. "And when I reached around to put it on the car hood, he began running away from the scene." (Tr., p. 71).

After a foot chase, Chambers was arrested. He was validly arrested for resisting arrest. (Tr., p. 72). He was searched as an incident to that arrest. (Tr., p. 15). United States v. Robinson, 414 U.S. 218, 235 (search incident to lawful custodial arrest "is not only an exception to the warrant requirement of the Fourth Amendment, but is also a reasonable search under that Amendment.") In the defendant's left front pocket were two plastic baggies containing crystal-like material, one the size of a golf ball and one bigger than a golf ball, and a 10-millimeter 3/8 inch drive socket and three small plastic baggies. (Tr., p. 73).

On cross-examination, Officer Washburn was asked if Mr. Chambers said he was on parole

- 11 -

and didn't want to go back. Washburn said, "He said it twice." "The second time he said it, he said he did not want to have to deal with the police." (Tr., p. 84).

Still on cross-examination, Washburn was asked if he was told according to the standard operating procedure of his department when he can conduct a pat-down search. Washburn responded in the affirmative and was then asked, "And when is that?" Washburn responded, "When we feel unsafe."[3] Asked if he felt unsafe that day, Washburn responded, "Yes. With the movements we didn't – I didn't know what was going to happen." (Tr., p. 86).

Officer Washburn specified what caused him to feel unsafe: "It was the constant movements and looking around."

Still on cross-examination, Washburn was asked if he could describe the movement he had talked about: "Well, he was asked to put his hands on the hood, which he did. Then he would stand up, cross his arms. Back up. Sir, put your hands on the hood. Looking around. Constant movement." (Tr., p. 88).

Officer Washburn was asked if, when he saw him "raise up, put down, raise up, put down, look around," did that cause him to feel unsafe. Officer Washburn responded,

> Well, I wasn't sure what his next move was going to be: If he was trying to pull a weapon out, or if he was going to run, or if he was going to swing an arm around and try to strike me. I had no idea.

(Tr., p. 88). When asked if, in his report, Washburn had said that once Washburn began the pat-down search, Chambers kept remaining calm. Responding "Yes," Washburn stated, "He didn't – once I started the pat down he did not move around like he had been." Asked if Chambers was no

---

[3]The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27, 88 S.Ct. 1868.

longer combative verbally or agitated, Washburn said, "Well, he was constantly saying this is BS, and, you know, but it didn't – he stopped his movements." (Tr., p. 89).

In <u>Illinois v. Wardlow</u>, the Supreme Court stated, "Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. (citations omitted) 528 U.S. 119, 124, 120 S.Ct. 673, 676."

In <u>United States v. Oliver</u>, 550 F.3d 734 at 739 (8th Cir. 2008), the Court of Appeals for the Eighth Circuit, quotes from <u>United States v. Menard</u>, 95 F.3d 9, 11 (8th Cir. 1996), "The Supreme Court has frequently noted the inherent danger traffic stops pose to police officers and the consequent likelihood that minimally intrusive weapon searches will be reasonable."

The court finds the following articulable circumstances are supported by the evidence and justified Officer Washburn's concern for his safety and that of the other officers and his decision to conduct a pat-down search of Mr. Chambers:

    1. the police encounter with Mr. Chambers occurred during the course of a traffic stop; see <u>United States v. Oliver</u>, 550 F.3d 734, 738 (8th Cir. 2008);

    2. the traffic stop occurred late at night; <u>Oliver</u>, <u>id</u>.;

    3. Mr. Chambers's automobile was the only vehicle on the street; (Tr., p. 17);

    4. as he approached the driver's window, Officer Rose smelled a faint to mild odor of alcohol;

    5. Mr. Chambers admitted he had been drinking earlier that day; (Tr., p. 22);

    6. Chambers seemed "to be overwhelmed more than what I [Rose] would see on a routine stop." (Tr., p. 10);

7. his eyes were glassy and his pupils were constricted; his speech was somewhat slurred;

8. every time Rose would get close to Chambers, Chambers would step back, cross his arms, put his arms down, constantly looking side to side; (Tr., p. 66);

9. Chambers advised Washburn that he was just agitated that he would be asked to even step out of the vehicle; he'd done nothing wrong. He said he was on parole, that he didn't want to have any dealings with the police, because he didn't want to have to go back. (Tr., p. 67);

10. constant movement by Chambers of his hands and arms and his looking from side to side; (Tr., pp. 68, 86).

11. knowledge that Chambers was on parole without knowing what felony he had been convicted of; (Tr., p. 67);

The court finds the pat-down search of Robert Chambers was justified by the foregoing articulable circumstances causing Officer Washburn to be concerned for his safety and that of the other officers. The articles recovered from the right side of Robert Chambers's clothes were legally seized, including the large amount of cash removed from Chambers's right front pants pocket.

In his post-hearing memorandum (Document #37), the defendant discusses attenuation as a possible ground for the admissibility of evidence following illegal police action. The court finds that Officer Washburn's pat-down search of Mr. Chambers was not an illegal search but was justified by Chambers's actions which caused Washburn to pat down Chambers for officer safety. The court finds the patdown was not illegal activity but was justified and legal.

### Did the Patdown Cause Chambers to Flee?

In his post-hearing memorandum, the defendant urges that the pat-down search of Chambers was illegal and that the evidence found on the defendant was "fruit of the poisonous tree" and subject to the exclusionary rule, citing Wong Sun v. United States, 371 U.S. 471 (1963). (Doc. #37, p. 8).

As this court has found, the patdown of Chambers was not illegal. However, even if it were, the evidence obtained after Chambers's flight would still be admissible as incident to the valid arrest of Chambers for resisting arrest.

When discussing attenuation as a possible ground to erase the alleged "taint" of the pat down claimed to be illegal by the defendant, and discussing the concept of intervening circumstances, the defendant urges that the pat down was the cause of the defendant's flight, that Washburn created the situation "in which the criminal response is predictable, such as creating a situation where the criminal will flee which, in turn, will give the police an independent basis for an arrest, and thus, a search incident to arrest." (Doc. #37, p. 9), quoting from United States v. Green, 111 F.3d 515, 522 (7th Cir. 1997).

This court rejects the defendant's argument that the pat down caused Chambers to flee. Robert Chambers, having been convicted of a felony, having served time in prison and being on parole was no neophyte to the criminal justice system. In Green, considering the discovery of an arrest warrant for Defendant Green as an intervening circumstance which dissipated any taint of an illegal automobile stop, the Seventh Circuit relied on cases from the Fifth Circuit, the Eighth Circuit and the Eleventh Circuit. Like Green, these cases all rejected the defendant's argument. In each of these cases, the original seizure was arguably unconstitutional but after the initial illegal stop, circumstances developed giving police probable cause to lawfully arrest the defendants. In arresting the defendants, the police conducted searches incident to the arrests and found incriminating evidence.

In the Eighth Circuit decision, United States v. Dawdy, 46 F.3d 1427, 2431 (8th Cir. 1995), the Court held that the stop was good, but assuming arguendo the "initial stop and arrest of Dawdy were invalid, Dawdy's resistance provided independent grounds for his arrest and the evidence discovered in the subsequent searches of his person and his automobile is admissible." 46 F.3d at 1431. (emphasis added for resistance)

The Fifth Circuit, in United States v. Garcia-Jordan, 860 F.2d 159 (5th Cir. 1988), drew on a statement from the Ninth Circuit case of United States v. Mitchell, 812 F.2d 1250 (9th Cir. 1983), to express the difference between how the commission of a crime and testimonial or physical evidence are treated when it comes to the question of suppression:

> Committing a crime is far different from making an inculpatory statement, and the treatment we afford the two events differs accordingly. An inculpatory statement usually relates to a previously committed illegal act; there is nothing unlawful about the statement itself. A crime, on the other hand, whether committed by word or deed is by definition an act that violates the law. We exclude inculpatory evidence when it is obtained as a result of an unlawful search or seizure. We have never, however, applied the exclusionary rule as a bar to the prosecution of a crime.

The court finds the seizure of the items from the defendant's left front pocket, namely crystal methamphetamine, three small plastic baggies and a 10 mm 3/8 drive socket wrench, was legal pursuant to a search incident to arrest, should not be suppressed and are admissible in court. See Section 575.150 R.S.Mo. 2009.[4]

---

[4] That statute provides that a person commits the crime of resisting arrest if, knowing that a law enforcement officer is making an arrest, or attempting to lawfully detain an individual, for the purpose of preventing the officer from effecting the arrest or detention, the person resists the arrest or detention of such person by fleeing from such officer.

**IT IS, THEREFORE, RECOMMENDED** that Defendant's Motion to Suppress Evidence (Document #28) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

                    */s/ Lewis M. Blanton*
                    LEWIS M. BLANTON
                    UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of June, 2013.